RUBIN LLC
Paul A. Rubin
Hanh V. Huynh
11 Broadway, Suite 715
New York, New York 10004
Tel: 212.390.8054
Fax: 212.390.8064
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel for Taron Partners, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ARTETA LLC, | : | |
| | : | Case No.: 26-22329 (KYP) |
| Debtor. | : | |

# LIMITED OBJECTION OF TARON PARTNERS, LLC TO DEBTOR'S BIDDING PROCEDURES AND SALE MOTION

Taron Partners, LLC (the "Secured Creditor"), by its undersigned counsel, files this limited objection (this "Objection") to the motion (the "Sale Motion") [ECF No. 21] filed by Arteta LLC (the "Debtor") seeking entry of orders, pursuant to section 105(a), 363(b), (f), and (m), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, 6006-1, 9006-1, 9013-1, 9014-1 and 9014-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"):

> (I) in the form annexed as Exhibit A to the Sale Motion (the "Bidding Procedures Order"), (a) authorizing the Debtor to sell the Debtor's Property (defined below) in accordance with the proposed bidding procedures annexed as Exhibit "1" to the Bidding procedures Order (the "Bidding Procedures"), (b) approving the Bidding Procedures, (c) authorizing the Debtor to enter into a stalking horse contract in the form annexed as Exhibit C to the Sale Motion (the "Stalking Horse Contract") with St. Tropez Contracts LLC (the "Stalking Horse"), (d) approving the bid protections in the form of the expense reimbursement and break-up fee, (e) scheduling the

> auction sale of the Property and the hearing on approval of the sale, (f) establishing procedures for the assumption and assignment of the Debtor's executory contracts and unexpired leases, and (g) approving the form and manner of notice of the auction and sale hearing;
>
> and (II) in the form annexed as Exhibit B to the Sale Motion (the "Sale Order"), (a) approving the Stalking Horse Contract, or such other purchase agreement entered into in accordance with the Bidding Procedures, and (b) approving the sale of the Property to the Stalking Horse or such other successful bidder at the auction.

In support of this Objection, the Secured Creditor respectfully represents as follows:

**PRELIMINARY STATEMENT**

1. The Secured Creditor does not object, in concept, to a sale of the Property. But as set forth more fully below, the procedures proposed by the Debtor to effectuate the sale (including a number of provisions in the Bidding Procedures and the form of the Stalking Horse Contract) do not adequately take into account the Secured Creditor's mortgage interest in the Property, are internally inconsistent, and/or are inconsistent with standard practices for the sale of real property in this District.

**BACKGROUND**

2. On April 1, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code commencing the above-captioned chapter 11 case (the "Chapter 11 Case"). No trustee or committee has been appointed in the Chapter 11 Case.

**The Loan and the Loan Documents**

3. On or about March 2, 2021, ConnectOne Bank ("ConnectOne") made a loan to the Debtor in the original principal amount of $2,640,000 (the "Loan") evidenced by, among other things, (i) that certain Mortgage Loan Note dated March 2, 2021 (the "Note") executed by the Debtor in favor of ConnectOne in the original principal amount of $2,640,000, (ii) that certain Mortgage, Security Agreement and Assignment of Leases and Rents dated March 2, 2021 executed by the Debtor in favor of ConnectOne (the "Mortgage"), pursuant to which the Debtor granted to

ConnectOne a mortgage lien on certain real property, and the improvements thereon, located at 51 South Route 9W, West Haverstraw, New York 10993 (the "Property"), (iii) that certain Assignment of Leases and Rents dated March 2, 2021 executed by the Debtor in favor of ConnectOne, and (iv) that certain Guarany dated March 2, 2021 (the "Guaranty") made by Highbury Concrete Inc., Highbury Holdings Inc., Thomas Gorman, Thomas Forgarty, and Bernard Griffin (collectively, the "Guarantors") in favor of ConnectOne. The foregoing documents, and all other documents executed in connection with the Loan, are referred to herein collectively as the "Loan Documents."

**The Foreclosure Action**

4. By letter dated April 2, 2025, ConnectOne notified the Debtor and the Guarantors of certain defaults under the Note and Mortgage, including, *inter alia*, the Debtor's continuing failure to timely pay the interest and principal payments due under the Note (the "Events of Default").

5. As a result of the occurrence of the Events of Default, on or about May 7, 2025, ConnectOne commenced an action, which is pending under index number 032951/2025 (the "Foreclosure Action"), to foreclose on the Mortgage in Supreme Court of the State of New York, County of Rockland (the "State Court") by filing a Verified Complaint dated May 7, 2025.

**The Chapter 11 Case**

6. During the pendency of the Foreclosure Action, the Debtor commenced the Chapter 11 Case on April 1, 2026. In its schedules of assets and liabilities filed with its bankruptcy petition, the Debtor lists value of the Property at $2,800,000.00.

7. On April 29, 2026, the Debtor filed an application, by notice of presentment, to approve the retention of Royal Properties Inc. (the "Broker") as the Debtor's real estate broker for the sale of the Property. On June 15, 2026, the Court entered an order approving the retention of the Broker. *See* ECF No. 15. The Debtor's listing agreement with the Broker, and the Court's order

approving the Debtor's retention of the Broker, do not address how or in what amount the Broker would be compensated if the Secured Creditor is the successful purchaser of the Property via a credit bid.

8. On June 15, 2026, the Court entered an order establishing July 27, 2026 as the deadline for non-governmental units to file proofs of claims against the Debtor. *See* ECF No. 16.

9. On June 12, 2026, ConnectOne timely filed its proof of claim (the "ConnectOne POC") against the Debtor, designated as claim number 4 on the Debtor's claims register.

**The Assignment of the Loan Documents**

10. On or about August 31, 2026, ConnectOne assigned to the Secured Creditor all of its rights, title, and interest in and to the Loan Documents, including the Note and Mortgage. On September 1, 2026, pursuant to Bankruptcy Rule 3001(e)(2), the Secured Creditor filed in the Chapter 11 Case a Notice of Transfer of Claim Other Than for Security, together with an Evidence of Transfer of Claim [ECF No. 22], with respect to the transfer of the ConnectOne POC to the Secured Creditor. In light of the foregoing, the Secured Creditor is the current owner, assignee, and holder of the Loan Documents, including the Note and Mortgage, and the holder of the ConnectOne POC.

11. The Secured Creditor holds a secured claim against the Debtor in the total amount of $2,976,180.90 as of the Petition Date, plus all fees and expenses and any other amounts due and owing under the Loan Documents as of the Petition Date. The Secured Creditor reserves its right to assert any post-Petition Date costs, fees, expenses and charges, including attorney's fees, and other amounts, post-petition interest (including default interest) to the extent allowable under the Bankruptcy Code, and any other liabilities of or amounts owed by the Debtor to the Secured Creditor.

**The Sale Motion**

12. On August 19, 2026, the Debtor filed the Sale Motion, seeking approval of the proposed Bidding Procedures Order (and the Bidding Procedures annexed thereto) for the auction sale of the Property. The Sale Motion also seeks approval of an expense reimbursement in the amount of up to $50,000 (the "Expense Reimbursement") and a break-up fee of $48,000 (the "Break-Up Fee") payable to the Stalking Horse if it is not the purchaser.

13. The Debtor acknowledges in its Sale Motion that it had only engaged in an "informal marketing process" for the Property (*see* Sale Motion ¶ 11), and thus the actual, wider marketing of the Property only occurred (if at all) post-petition with the retention of the Broker at the end of April 2026. The order approving the retention of the Broker was entered on June 15, 2026, but the Stalking Horse Contract was executed less than one month later, on July 6, 2026, with a purchase price of only $1.6 million, which is well below the Debtor's scheduled value of $2.8 million for the Property.

14. The Sale Motion seeks, among other things, approval of Bidding Procedures for the sale of the Property which include the following provisions relevant to this Objection:

- A bid deadline of October 22, 2026 and an auction date of October 27, 2026 (Bidding Procedures ¶ C)
- The Property is to be sold free and clear of all liens, claims and encumbrances, on an "as is, where is" basis, without representations or warranties of any kind (Bidding Procedures ¶ D)
- A minimum bid of the purchase price under the Stalking Horse Contract ($1.6 million), *plus* $50,000 for the Expense Reimbursement, *plus* $48,000 for the Break-Up Fee, *plus* a minimum overbid of $52,000 (Bidding Procedures ¶ G(d))
- The Debtor must provide copies of all qualified bids to the Stalking Horse at least 24 hours in advance of the auction (Bidding Procedures ¶ H)
- Closing on the sale of the Property is to occur by the later of (i) the Sale Order becoming a final, non-appealable order, and (ii) the next business day

after fourteen (14) days after entry of the Sale Order (Bidding Procedures ¶ J)

- The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the sale of the Property, the Bidding Procedures Order, the Sale Order, and the auction (Bidding Procedures ¶ K)

15. The Sale Motion also seeks approval of the Stalking Horse Contract, which contains the following terms relevant to this Objection:

- A purchase price of $1.6 million, with a $80,000 deposit (constituting a mere 5% of the purchase price) (Stalking Horse Contract § 2)

- The Debtor's representations and warranties regarding environmental issues with the Property, which representations and warranties survive closing for twelve months (Stalking Horse Contract § 7)

- Closing on the sale of the Property is to occur no later than sixty (60) days after entry of the Sale Order, and such order has become final and non-appealable (Stalking Horse Contract § 9)

- The Debtor must indemnify the Stalking Horse against any claims relating to brokerage commissions or finder's fees for the transaction (Stalking Horse Contract § 10)

- The Debtor represents that it has disclosed all known material defects in the Property (Stalking Horse Contract § 16)

- The Debtor makes various representations and warranties to the Stalking Horse(Stalking Horse Contract § 17)

- The parties agree that disputes shall be brough in any court of competent jurisdiction in the State of New York (Stalking Horse Contract § 19)

- Only the Debtor and the Stalking Horse are notice parties under the Stalking Horse Contract (Stalking Horse Contract § 23)

- A defaulting party has a 15-day cure period after receipt of a default notice from the non-defaulting party, so the closing of the sale is not "Time of the Essence." (Stalking Horse Contract § 33)

- Stalking horse protections in the form of a break-up fee equal to 3% of the winning bid, and an ***uncapped*** expense reimbursement (Stalking Horse Contract § 37)

**OBJECTION**

**<u>The Bidding Procedures Are Not Acceptable And/Or Are Inadequate</u>**

16. Certain proposed Bidding Procedures provisions are unacceptable, and other, necessary provisions are missing.

17. The absence of protections of the Secured Creditor's credit bidding rights bars the approval of the Bidding Procedures as proposed by the Debtor. Section 363(k) of the Bankruptcy Code expressly provides for a secured creditor's right to credit bid for property securing its lien in a section 363 sale of such property. *See* 11 U.S.C. § 363(k). "The ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." *Radlax Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.3 (2012).

18. Given the clear statutory right of the Secured Creditor to credit bid, the Bidding Procedures should expressly provide that the Secured Creditor may credit bid up to the full amount of its claim at the auction sale of the Property so that interested parties and qualified bidders will be provided notice of the Secured Creditor's credit bid rights. Such provisions are typical in bidding procedures for section 363 sales of real property, and there is no reason why they should be excluded from the Bidding Procedures in this case.

19. Similarly, the Bidding Procedures do not provide that the Secured Creditor is deemed a Qualified Bidder (as defined in the Bidding Procedures) and entitled to attend the auction without the need for the Secured Creditor to satisfy the requirements to become a Qualified Bidder or to submit a qualified bid, including the need to provide a deposit. Nor do the Bidding Procedures provide consultation rights to the Secured Creditor regarding such things as the evaluation of bids, adjournments, and modifications of the Bidding Procedures, despite the fact that the Property is to

be sold free and clear of the Secured Creditor's mortgage lien. These are additional examples of provisions that are typically included in bidding procedures in chapter 11 single asset real estate cases.

20. The Bidding Procedures should also specify when bidders will be notified whether they have been recognized as Qualified Bidders entitled to participate in the auction. At the auction, all bids should be announced publicly at the auction and the proceedings should be transcribed by a court reporter so that a clear record of the auction and bidding can be created.

21. The Bidding Procedures also contain provisions that are inappropriate and should not be approved. First, the Stalking Horse's bid should not be a Qualified Bid because it is too low. Common sense dictates that the minimum bid for the Property should be at least the scheduled value of the Property, which is $2.8 million. *See* Bidding Procedures ¶ G(d). Second, bid packages from Qualified Bidders should not be shared with the Stalking Horse prior to the auction, as this may create an unfair advantage for the Stalking Horse. *See* Bidding Procedures ¶ H. Third, the Debtor should be required to conduct the auction if it receives more than one Qualified Bid. The Debtor should not have discretion over whether to conduct the auction if there are Qualified Bidders who can bid on the Property. *See* Bidding Procedures ¶ H.

22. The Bidding Procedures do not address how or in what amount the Broker is to be compensated if the Secured Creditor is the winning bidder via a credit bid. The Secured Creditor does not object to the Broker receiving a commission if it produces a cash sale of the Property to an independent third party. But the Broker did not introduce the Secured Creditor to the Property, and the Secured Creditor is not a party to the Debtor's retention agreement with the Broker. The Secured Creditor respectfully submits that it should not be forced to pay a full brokerage commission if the Secured Creditor is the wining bidder via a credit bid. That is certainly not

standard bankruptcy practice.

**<u>Objections To Certain Terms Of The Stalking Horse Contract</u>**

23. The Stalking Horse Contract should also be modified to be consistent with the Bidding Procedures and to address certain deficiencies and improper provisions.

24. As discussed above, the Stalking Horse Contract should not be approved with a purchase price of $1.6 million for the Property. Acceptance of an offer of only $1.6 million for real property that the Debtor itself values at $2.8 million, and which is encumbered by the Secured Creditor's secured claim of more than $2.9 million, is not an exercise of the Debtor's sound business judgment.

25. The Bidding Procedures provide that the Property will be sold "as is, where is" without any representations and warranties, but the Stalking Horse Contract contains representations and warranties by the Debtor, including the highly unusual provision that environmental representations and warranties survive twelve months post-closing. *Compare* Bidding Procedure ¶ G(k) *with* Stalking Horse Contract §§ 7, 16 & 17. The Debtor's representations and warranties should be removed from the Stalking Horse Contract.

26. The Stalking Horse Contract provides for a closing date that is no later than 60 days after the Sale Order becomes final and non-appealable, but this timeframe is inconsistent with the requirements under the Bidding Procedures to close on the transaction by the later of (i) the Sale Order becoming a final, non-appealable order, and (ii) the next business day after fourteen (14) days after entry of the Sale Order. *Compare* Stalking Horse Contract § 9 *with* Bidding Procedures ¶ J. The timing of the closing under the Stalking Horse Contract should be consistent with the Bidding Procedures, with time being of the essence as against the purchaser.

27. The Stalking Horse Contract requires the Debtor to indemnify the Stalking Horse if any claim is made for a commission by a third-party broker. *See* Stalking Horse Contract § 10. The

Debtor's estate should not responsible to incur costs associated with any claim by a broker that has not been approved by the Court.

28. The Stalking Horse Contract provides that disputes may be resolved in a New York state court. *See* Stalking Horse Contract § 19. This Court should have exclusive jurisdiction to determine disputes relating to the sale of the Property.

29. The Stalking Horse Contract provides for a 15-day cure period to cure defaults. *See* Stalking Horse Contract § 33. The Stalking Horse's obligation to close should be TIME OF THE ESSENCE as against the purchaser, which is typical in section 363 sales of real property.

30. The bid protections provided to the Stalking Horse in the form of the Break-Up Fee and the Expense Reimbursement are not appropriate in this case (where the Stalking Horse bid is well-below the value of the Property) and should not be approved. Moreover, while the Expense Reimbursement in the Bidding Procedures is capped at an exorbitant $50,000, the Expense Reimbursement provided in the Stalking Horse Contract is not capped at all.

WHEREFORE, the Secured Creditor respectfully requests that the Court deny the relief in the Sale Motion as currently requested by the Debtor, deny approval of the Stalking Horse Contract in the form annexed to the Sale Motion, modify the Bidding Procedures Order consistent with this Objection, and grant the Secured Creditor such other and further relief as is just and proper.

Dated: New York, New York
September [ ], 2026

RUBIN LLC

By: *___/s/ Paul A. Rubin_____*
Paul A. Rubin
Hanh V. Huynh
11 Broadway, Suite 715
New York, New York 10004
Tel: 212.390.8054
prubin@rubinlawllc.com
hhuynh@rubinlawllc.com

*Counsel for Taron Partners, LLC*