# Contract of Sale – Office, Commercial and Multi-Family Residential Premises

**Between**

**ARTETA, LLC (“Seller”)**

**and**

**____________________________________________ (“Purchaser”)**

**dated ______________**

**Premises:**

| | |
|---|---|
| Street Address: | 51 South Route 9W |
| City or Town: | West Haverstraw |
| County: | Rockland |
| State: | New York |

## Table of Contents


Section 1. Sale of Premises and Acceptable Title........1

Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons........2

Section 3. The Closing........7

Section 4. Representations and Warranties of Seller........7

Section 5. "As Is" Condition, No Representations Not Expressly Set Out in Contract, Representations and Warranties of Purchaser........12

Section 6. Seller's Obligations as to Leases........14

Section 7. Responsibility for Violations........16

Section 8. Destruction, Damage or Condemnation........17

Section 9. Covenants of Seller........19

Section 10. Seller's Closing Obligations........19

Section 11. Purchaser's Closing Obligations........22

Section 12. Apportionments........23

Section 13. Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien........25

Section 14. Broker........26

Section 15. Notices........27

Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations........27

Section 17. Due Diligence Period........27

Section 18. Miscellaneous Provisions........29


## SCHEDULES


Schedule A. DESCRIPTION OF PREMISES........A-1

Schedule B. PERMITTED EXCEPTIONS........B-1

Schedule C. PURCHASE PRICE........C-1

Schedule D. MISCELLANEOUS........D-1

Schedule E. RENT SCHEDULE........E-1

Schedule F. FORM OF ESTOPPEL LETTER........F-1

Schedule G. INSURANCE POLICIES........G-1

Schedule H. INTENTIONALLY OMITTED........H-1

Schedule I. SERVICE CONTRACTS ........................................................................ I-1
Schedule J. CERTIFICATE OF OCCUPANCY ........................................................ J-1
Schedule K. FORMS OF PURCHASE MONEY NOTE AND MORTGAGE .......... K-1

**Contract of Sale -- Office, Commercial and Multi-Family Residential Premises**

CONTRACT OF SALE ("Contract") dated _______________ between ___________________________ ("Seller" or "Debtor"), a debtor whose bankruptcy case is pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under Case No. 26-22329 (KYP) (the "Bankruptcy Case") and ______________________________ ("Purchaser").

Seller and Purchaser hereby covenant and agree as follows:

**Section 1. Sale of Premises and Acceptable Title**

§1.01. Subject to the terms of the Order entered by the Bankruptcy Court on _______(I)(A) Approving Bidding Procedures for the Sale of the Debtor's Property, (B) Scheduling a Sale Hearing, (C) Approving the Form, Manner and Extent of Notice of the Sale Process, and (II) Granting Related Relief (the "Auction and Bid Procedures Order"), the auction and bidding procedures approved by the Bankruptcy Court pursuant to the Auction and Bid Procedures Order (the Bid Procedures"), and an order entered or to be entered by the Bankruptcy Court, pursuant to Section 363 of the United States Bankruptcy, 11 U.S.C. § 101 et seq. as amended (the "Bankruptcy Code"), approving the sale from Seller to Purchaser (the "Sale Order"), Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in Schedule A attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; and (d) the appurtenances and all the estate and rights of Seller in and to the Land and Building (collectively, the "Premises"). To the extent any terms of this Contract are inconsistent with the terms of the Bid Procedures or the Sale Order, the Sale Order shall govern, followed by the Auction and Bid Procedures Order and the Bid Procedures. No amendment to any such document agreed to by Seller shall impair the Secured Creditor's rights under §§2.03, 18.01 or 18.02 without its prior written consent, except as otherwise ordered by the Bankruptcy Court after notice to the Secured Creditor (as hereinafter defined). For purposes of this contract, "appurtenances" shall include all right, title and interest of Seller, if any, in and to (i) streets, easements, rights-of-way and vehicle parking rights used in connection with the Premises; (ii) any strips or gores of land between the Land and abutting or adjacent properties; (iii) the leases, licenses and occupancy agreements for space in the Building, and all guarantees thereof, as shown on Schedule E attached hereto and any leases entered into by Seller between the date of this contract and the Closing (as hereinafter defined); (iv) the Service Contracts (as hereinafter defined); (v) plans, specifications, architectural and engineering drawings, prints, surveys, soil and substrata studies relating to the Premises in Seller's possession, whether or not stored, managed or contained on computer software or hardware; (vi) all operating manuals and books, data and records regarding the Premises and its component systems in Seller's possession; (vii) all licenses, permits, certificates of occupancy and other approvals issued by any state, federal or local authority relating to the use, maintenance or operation of the Premises or the fixtures, machinery or equipment included in this sale to the extent that they may be transferred or assigned; (viii) all

warranties or guaranties, if any, applicable to the Premises, to the extent such warranties or guaranties are assignable; (ix) all tradenames, trademarks, servicemarks, logos, copyrights and good will relating to or used in connection with the operation of the Premises and (x) air rights and development rights. This sale also includes all trade fixtures and all equipment, machinery, materials, supplies and other personal property attached or appurtenant to the Building or located at and used in the operation or maintenance of the Land or Building to the extent same are owned by Seller or any affiliate of Seller (the "Personal Property"). The street address of the Premises is set forth on Schedule D attached hereto.

§1.02. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this contract, the Bid Procedures and the Sale Order, subject only to: (a) the matters set forth in Schedule B attached hereto (collectively, "Permitted Exceptions"); and (b) such other matters as the title insurer specified in Schedule D attached hereto (or if none is so specified, then any title insurer licensed to do business by the State of New York) shall be willing to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises. Purchaser shall complete its title and survey review before submitting its final bid and waives objections to matters disclosed by, or discoverable upon, such review, except monetary liens required to be removed from the Premises pursuant to the Sale Order. Requirements of Purchaser's lender shall not constitute objections to title or conditions to Closing.

**Section 2. Purchase Price, Acceptable Funds, Existing Mortgages, Purchase Money Mortgage, Escrow of Downpayment and Foreign Persons**

§2.01. Purchaser shall pay Seller the purchase price ("Purchase Price") set forth on Schedule C attached hereto, subject to the terms and conditions of this contract, the Bid Procedures and the Sale Order, with time being of the essence as against the Purchaser. Seller and Purchaser acknowledge that no portion of the Purchase Price is allocated to the Personal Property, if any, transferred pursuant to this contract.

§2.02. All monies payable under this contract (other than a credit bid by Debtor's mortgagee, Taron Partners, LLC (the "Secured Creditor")) shall be paid by wire transfer of immediately available federal funds to an account designated by Seller and approved by Secured Creditor not less than three business days prior to the Closing or as otherwise required by the Bid Procedures and the Sale Order.

§2.03. (a) All sums paid on account of the Purchase Price prior to the Closing (collectively, "Downpayment") shall be paid in accordance with the terms of the Bid Procedures Order delivered to Seller's attorney ("Escrowee"). The amount of the Down Payment shall be equal to ten percent (10%) of the Purchase Price. The Downpayment shall be immediately non-refundable upon execution of this Contract by Seller and Seller's acceptance of Purchaser's offer and shall be applied to the Purchase Price. The Escrowee shall hold the proceeds thereof in escrow in a non-interest bearing IOLA bank account at J.P. Morgan Chase Bank, N.A. (or as otherwise agreed in writing by Seller, Purchaser and Escrowee) until the Closing or as otherwise required by the Bid Procedures and the Sale Order. The failure of Purchaser to timely deliver any potion of the Downpayment as required by the Bid Procedures or the Sale Order shall, at Seller's option, cause this Contract to be terminate, and thereafter neither party shall have any further obligation under

this Contract. If the transaction is not terminated, then the Downpayment shall be retained by the Seller as liquidated damages, subject to the lien of the Secured Creditor. Escrowee shall hold such proceeds in an interest-bearing account, and such interest shall be paid to the same party entitled to the Downpayment, and the party receiving such interest shall pay any income taxes thereon. The tax identification numbers of the parties are set forth in Schedule D. Each of the parties, upon Escrowee's request, shall promptly furnish to Escrowee a completed and executed Form W-9, together with such other information as Escrowee shall reasonably require. At the Closing, the Downpayment hall be paid by Escrowee in accordance with the terms of the Sale Order and this Contract. All disbursements shall comply with §18.02 and the Bankruptcy Court's distribution order; no refund or other disposition is permitted without the Secured Creditor's written approval or an order of the Bankruptcy Court.

(b) The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that the duties of Escrowee hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Downpayment in accordance with the provisions of this contract, that Escrowee shall not be deemed to be the agent of either of the parties, and that Escrowee shall not be liable to either of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this contract or involving gross negligence on the part of Escrowee.

(c) Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this contract.

(d) If Escrowee is Seller's attorney, Escrowee or any member of its firm shall be permitted to act as counsel for Seller in any dispute as to the disbursement of the Downpayment or any other dispute between the parties whether or not Escrowee is in possession of the Downpayment and continues to act as Escrowee.

(e) Escrowee may act or refrain from acting in respect of any matter referred to in this section in full reliance upon the Bid Procedures, the Sale Order.

§2.04. If Seller is a "foreign person", as defined in Internal Revenue Code Section 1445 and regulations issued thereunder (collectively, the "Code Withholding Section"), or if Seller fails to deliver the certification of non-foreign status required under §10.01(i)(ii), or if Purchaser is not entitled under the Code Withholding Section to rely on such certification, Purchaser shall deduct and withhold from the Purchase Price the amount required by the Code Withholding Section and shall deposit the withheld amount at Closing with the closing escrow agent for timely remittance to the Internal Revenue Service with the required forms. Withholding shall be applied toward, and shall not reduce, the Purchase Price or entitle Purchaser to terminate or adjourn Closing.

**Section 3. The Closing**

§3.01. Except as otherwise provided in this contract, the closing of title pursuant to this contract ("Closing") shall take place on the scheduled date and at the time of closing specified in Schedule D (the actual date of the Closing being herein referred to as "Closing Date") at the place specified in Schedule D. TIME IS OF THE ESSENCE as to Purchaser's funding and Closing obligations on the date fixed in Schedule D and the Bid Procedures, without further notice or demand. Purchaser has no right to a customary adjournment or an extension for financing or title-insurer requirements. Any extension requires Seller's and the Secured Creditor's written consent, except as otherwise required by an operative court order.

**Section 4. Representations and Warranties of Seller**

Seller represents and warrants to Purchaser as follow:

§4.01. Seller is the sole owner of the Premises and has not granted any option to purchase the Premises or any right of first refusal or right of first offer to purchase the Premises.

§4.02. The information concerning written leases, written licenses and written occupancy agreements (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies or occupancies in the Premises not arising out of the Leases (collectively, "Tenancies"; and each, individually, a "Tenancy") set forth in Schedule E attached hereto ("Rent Schedule") is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and there are no Leases or Tenancies of any space in the Premises other than those set forth therein and any subleases or subtenancies. Except as otherwise set forth in the Rent Schedule or elsewhere in this contract:

(a) there are no security deposits other than those set forth in the Rent Schedule; and

(b) the Rent Schedule accurately sets out all security deposits held by Seller with respect to the Leases and Tenancies.

§4.03. Schedule G attached hereto lists all insurance policies presently affording coverage with respect to the Premises, and the information contained therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.04. Intentionally omitted.

§4.05. The schedule of service, maintenance, supply and management contracts ("Service Contracts") attached hereto as Exhibit I lists all such contracts affecting the Premises, and the information set forth therein is accurate as of the date set forth therein or, if no date is set forth therein, as of the date hereof.

§4.06. (a) As of the date of this contract: The assessed valuation of the Land and Building and the real estate taxes set forth in Schedule D, if any, are the assessed valuation of the Premises and the real estate taxes payable with respect thereto for the fiscal year(s) indicated in such schedule (subject to any abatements that may become applicable after the date of this contract and

any increases or changes in real estate taxes resulting from a retroactive change in the tax rate). Except as otherwise set forth in Schedule D, there are no tax abatements or exemptions affecting the Premises as of the date of this contract.

(b) There are no pending proceedings or appeals to correct or reduce the assessed valuation of the Premises.

§4.07. The Personal Property, as of the Closing Date, is owned by Seller free of liens and encumbrances other than the lien(s) of the Existing Mortgage(s), if any.

§4.08. To Seller's knowledge no incinerator, compactor, boiler or other burning equipment on the Premises is being operated in violation of applicable law. If copies of a certificate or certificates of operation therefor have been exhibited to and initialed by Purchaser or its representative, such copies are true copies of the originals.

§4.09. Seller is not a "foreign person" as defined in the Code Withholding Section.

§4.10. Seller is a ________________ that has been duly organized and is in good standing under the laws of the state of its formation.

§4.11. Seller has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and consummate the transaction contemplated hereby, subject to the terms of the Bid Procedures and the Sale Order. The person signing this contract on behalf of Seller is authorized to do so. Assuming this contract has been duly authorized, executed and delivered by each of the other party(ies) to this contract, this contract and all obligations of Seller hereunder are the legal, valid and binding obligations of Seller, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by the Bid Procedures Order, the Sale Order, the Bankruptcy Code and applicable case law interpreting or applying the Bankruptcy Code.

§4.12. The Premises constitute one tax lot.

§4.13. Seller has not received written notice of and has no knowledge of any action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Seller with respect to the Premises which if adversely determined could have a material adverse effect on the Premises or interfere with the consummation of the transaction contemplated by this contract.

§4.14. Seller is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Persons," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and Seller is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity, or nation.

§4.15. Seller has been known by no other name for the past ten (10) years except: __________.

§4.16. The representations and warranties of Seller set forth herein in shall not survive the Closing. Except where limited specifically to the date of this contract or other date, the representations and warranties made by Seller in this contract are made as of the date of execution and delivery of this contract, and except as otherwise set forth in §6.05, shall be deemed restated and shall be true and accurate on the Closing Date. No inaccuracy disclosed to Purchaser before its final bid, or known to Purchaser when it submitted that bid, shall excuse Closing or support a credit or claim against Seller. No immaterial inaccuracy shall excuse or delay Closing.

**Section 5. "As Is" Condition, No Representations Not Expressly Set Out in Contract, Representations and Warranties of Purchaser**

§5.01. Purchaser acknowledges that, notwithstanding anything to the contrary contained herein, Purchaser:

EXPRESSLY UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE CONVEYANCE OF THE PREMISES SHALL BE MADE BY SELLER TO PURCHASER ON AN "AS IS, WHERE IS" BASIS AND WITH ALL FAULTS, AND PURCHASER ACKNOWLEDGES THAT PURCHASER HAS AGREED TO BUY THE PREMISES IN ITS PRESENT CONDITION AND THAT PURCHASER IS RELYING SOLELY ON ITS OWN EXAMINATION AND INSPECTIONS OF THE PREMISES AND NOT ON ANY STATEMENTS OR REPRESENTATIONS MADE BY SELLER OR ANY AGENTS OR REPRESENTATIVES OF SELLER. ADDITIONALLY, PURCHASER HEREBY ACKNOWLEDGES THAT SELLER MAKES NO WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PREMISES OR ANY PORTION THEREOF, OR WITH RESPECT TO THE ECONOMICAL, FUNCTIONAL, ENVIRONMENTAL OR PHYSICAL CONDITION, OR ANY OTHER ASPECT, OF THE PREMISES. SELLER HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING: (i) THE NATURE AND CONDITION OF THE PREMISES OR ANY PART THEREOF, INCLUDING BUT NOT LIMITED TO ITS WATER, SOIL, OR GEOLOGY, OR THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER MAY ELECT TO CONDUCT THEREON, OR ANY IMPROVEMENTS PURCHASER MAY ELECT TO CONSTRUCT THEREON, OR ANY INCOME TO BE DERIVED THEREFROM, OR ANY EXPENSES TO BE INCURRED WITH RESPECT THERETO, OR ANY OBLIGATIONS OR ANY OTHER MATTER OR THING RELATING TO OR AFFECTING THE SAME; (ii) THE ABSENCE OF ASBESTOS OR ANY ENVIRONMENTALLY HAZARDOUS SUBSTANCES ON, IN OR UNDER THE PREMISES OR ON, IN OR UNDER ANY PROPERTY ADJACENT TO, IN THE VICINITY OF OR ABUTTING THE PREMISES; (iii) THE MANNER OF CONSTRUCTION OR CONDITION OR STATE OF REPAIR OR LACK OF REPAIR OF ANY IMPROVEMENTS; AND (iv) THE COMPLIANCE OF THE PREMISES OR THE OPERATION OF THE PREMISES OR ANY PORTION THEREOF WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY; AND (v) THE NATURE OR EXTENT OF ANY EASEMENT, RESTRICTIVE COVENANT, RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE,

RESERVATION, CONDITION OR OTHER SIMILAR MATTER PERTAINING TO THE PREMISES, OR PORTION THEREOF. PURCHASER FURTHER ACKNOWLEDGES THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN FULLY EXPLAINED TO PURCHASER AND THAT PURCHASER FULLY UNDERSTANDS AND ACCEPTS THE SAME. THE PROVISIONS OF THIS PARAGRAPH SHALL SURVIVE CLOSING AND SHALL BE INCLUDED IN THE DEED.

§5.02. Purchaser further represents and warrants to Seller that:

(a) The funds comprising the Purchase Price to be delivered to Seller in accordance with this contract are not derived from any illegal activity.

(b) Purchaser has taken all necessary action to authorize the execution, delivery and performance of this contract and has the power and authority to execute, deliver and perform this contract and the transaction contemplated hereby. The person signing this contract on behalf of Purchaser is authorized to do so. Assuming this contract has been duly authorized, executed and delivered by each of the other party(ies) to this contract, this contract and all obligations of Purchaser hereunder are the legal, valid and binding obligations of Purchaser, enforceable in accordance with the terms of this contract, except as such enforcement may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c) The execution and delivery of this contract and the performance of its obligations hereunder by Purchaser will not conflict with any provision of any law or regulation to which Purchaser is subject or any agreement or instrument to which Purchaser is a party or by which it is bound or any order or decree applicable to Purchaser, and will not result in the creation or imposition of any lien on any of Purchaser's assets or property which would materially and adversely affect the ability of Purchaser to carry out the terms of this Contract. Purchaser has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery or performance by Purchaser of this Contract.

(d) Purchaser is a ________________ that has been duly organized and is in good standing under the laws of the state of its formation.

(e) To Purchaser's knowledge, there is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transaction contemplated by this contract.

(f) Purchaser is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation named by Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and Purchaser is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation.

(g) Purchaser acknowledges and agrees that Purchaser's obligations under this Contract are not subject to or conditioned upon Purchaser obtaining financing for the acquisition of the Premises. Purchaser represents and warrants that Purchaser has, or will have as and when required hereunder, sufficient immediately available funds to consummate the transaction contemplated by this Contract and to perform Purchaser's obligations hereunder. Purchaser has completed its due diligence before submitting its final bid. Neither further inspections or access, environmental or physical conditions, the status of any tenant or lease, nor approvals for Purchaser's intended use shall create a contingency, credit or extension right.

(h) The representations and warranties of Purchaser set forth in this Section 5 are made as of the date of this contract and are restated as of the Closing and shall survive the Closing for a period of [*one year*], except that the representation in §5.02(d) shall not survive the Closing.

For purposes of this §5.02, the phrase "to Purchaser's knowledge" shall mean the actual knowledge of _______________ without any special investigation.

(i) **Bankruptcy or Debt of Purchaser; Financial Condition.** Purchaser is not in the hands of a receiver and has not committed an act of bankruptcy or insolvency and has not commenced a case under the Bankruptcy Code. Purchaser's financial condition is, and shall at all times through the Closing Date remain, such as to enable Purchaser to perform all of its monetary obligations under this Agreement.

**Section 6. Seller's Obligations as to Leases**

§6.01. Unless otherwise provided in a schedule attached to this contract, Seller shall not, between the date of this contract and the Closing, without Purchaser's prior written consent, which consent shall not be unreasonably withheld or delayed: (a) amend, renew or extend any Lease in any respect, except to the extent required by law or by the express terms of such Lease; (b) grant a written lease to any person or entity occupying space without a Lease (except as required by law); (c) terminate any lease or Tenancy except by reason of a default by the tenant thereunder; (d) consent to the assignment of a Lease or subletting by any tenant except as required by the terms of the applicable Lease or by law or (e) permit anyone to use or occupy any space pursuant to an oral agreement except pursuant to the Tenancies. Seller shall not, without Purchaser's consent

(which may be granted or denied at Purchaser's discretion) enter into any lease or other occupancy agreement with any person or entity directly or indirectly affiliated with or related to Seller, Seller's managing agent, or any principal of Seller or Seller's managing agent (a "Related Lease Transaction").

§6.02. Unless otherwise provided in a schedule attached to this contract, Seller shall not, between the date of this contract and the Closing, permit the occupancy of, or enter into any new lease, occupancy agreement or license agreement for, space in the Building which is presently vacant or which may hereafter become vacant, without first giving Purchaser written notice of the identity of the proposed tenant, occupant or licensee, together with (a) either a copy of the proposed lease, occupancy agreement or license agreement, or a summary of the terms thereof in reasonable detail and (b) a statement of the amount of the brokerage commission, if any, payable in connection therewith and the terms of payment thereof.

If (y) Purchaser objects to such proposed lease, occupancy agreement or license agreement and notifies Seller of its objection within seven business days after receipt of Seller's notice, or (z) such lease, occupancy agreement or license agreement constitutes a Related Transaction, Seller shall not enter into the proposed lease, occupancy agreement or license agreement. If clause (y) applies and the prospective tenant, licensee or occupant would have commenced paying rent or a license fee prior to the Closing Date if Purchaser had not objected, Purchaser shall pay to Seller at the Closing, in the manner specified in §2.02, (A) the rent, additional rent and other charges that would have been payable under the proposed lease, occupancy agreement or license agreement from the date on which the tenant's, occupant's or licensee's obligation to pay rent would have commenced if Purchaser had not so objected until the Closing Date, less (B) the Reletting Expenses (hereinafter defined), as amortized over the period commencing on the proposed rent commencement date of such lease or agreement and ending on the proposed expiration date of such lease or agreement and apportioned as of the Closing Date. The "Reletting Expenses" shall equal the amount of the brokerage commission, any construction allowance or other monetary payment to be made to the proposed tenant, occupant or licensee, and the reasonable cost of decoration or other work required to be performed by the landlord under the terms of the proposed lease, occupancy agreement or license agreement to prepare the premises for the tenant's, occupant's or licensee's occupancy.

If Purchaser does not so notify Seller of its objection to a proposed lease, occupancy agreement or license agreement or consents to same and if such lease or agreement does not involve a Related Transaction, Seller shall have the right to enter into the proposed lease, occupancy agreement or license agreement with the tenant, occupant or licensee identified in Seller's notice. If Seller enters into such lease or agreement and Seller has reasonably incurred out-of-pocket expenses in connection with such transaction, including brokerage commissions, reasonable legal fees, and/or fix up costs (the "Leasing Expenses"), then:

1. If the new tenant or occupant is not required to commence paying, and does not pay, rent until after the Closing Date, Purchaser shall reimburse Seller at the Closing for all the Leasing Expenses and Seller shall pay to the appropriate parties the Leasing Expenses, which obligation shall survive the Closing; but

2. If the new tenant or occupant commences paying rent prior to the Closing Date, Purchaser shall pay Seller at Closing the unamortized portion of the Leasing Expenses. The Leasing Expenses shall be amortized over a period commencing on the rent commencement date under such lease or agreement and ending on the expiration date of such lease or agreement (not taking into account any renewal or extension rights), and the unamortized portion shall be determined as of the Closing Date. Seller shall pay to the appropriate parties the Leasing Expenses, which obligation shall survive the Closing.

If Seller fails to pay the Leasing Expenses as required by this Section, Seller shall indemnify and hold harmless Purchaser from all loss, cost, expense, liability, and damages, including reasonable attorneys' fees, Purchaser may incur by reason of such failure, which indemnification obligation shall survive Closing.

§6.03. If any space is vacant on the Closing Date, Purchaser shall accept the Premises subject to such vacancy, provided that the vacancy was not permitted or created by Seller in violation of any restrictions contained in this contract.

§6.04. Seller shall not grant any concessions or rent abatements for any period following the Closing without Purchaser's prior written consent.

§6.05. Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

**Section 7. Responsibility for Violations**

§7.01. Subject to the Sale Order, the premises are being sold subject to all notes or notices of violations of law or governmental ordinances, orders or requirements which were noted or issued on or before the Closing Date by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises without any obligation of Seller to cure the same or any abatement, credit, adjournment or termination right, except for a breach by Seller of its express covenants under this Contract. Monetary liens shall be treated as provided in the Sale Order.

§7.02. Seller's failure to remove or fully comply with any violations which a tenant unaffiliated with Seller is required to remove or comply with pursuant to the terms of its lease by reason of such tenant's use or occupancy shall not be an objection to title or a breach of Seller's obligations under this Section 7. Purchaser shall accept the Premises subject to all such violations without any liability of Seller with respect thereto or any abatement of or credit against the Purchase Price.

§7.03. No termination right is created by this Section 7.

§7.04. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

**Section 8. Destruction, Damage or Condemnation**

§8.01. Damage by Casualty.

(a) If all or any part of the Premises is damaged by fire or other casualty occurring on or after the date hereof and prior to the Closing Date, whether or not such damage affects a material part of the Premises, then neither party shall have the right to terminate this Agreement and the parties shall nonetheless consummate this transaction in accordance with this Agreement, without any abatement of the Purchase Price or any liability or obligation on the part of Seller by reason of such destruction or damage. In such event, subject to the Secured Creditor's rights and the Sale Order, Seller shall pay over to Purchaser the net amount of the insurance proceeds collected, or, if any proceeds have not been collected, Seller shall assign to Purchaser all its right, title and interest in and to the same and, in either such case, Purchaser shall receive no credit for any deductible, uninsured loss or deficiency in insurance proceeds.

(b) The parties understand and agree that the provisions of this Agreement shall govern and supersede the provision of any law applicable to the Premises governing the effect of fire or other casualty in contracts for real property, including but not limited to Section 5-1311 of the General Obligations Law of the State of New York.

§8.02. Condemnation. If after the execution and delivery of this contract and prior to Closing, any proceedings are instituted by any governmental authority which shall relate to the proposed taking of all or any portion of the Premises by eminent domain, or if any such proceedings are pending on the date of execution and delivery of this contract, or if all or any portion of the Premises is taken by eminent domain after the date of this contract and prior to the Closing, Seller shall promptly notify Purchaser in writing no later than two business days after Seller's receipt of any notification or the date of Closing, whichever occurs earlier. Purchaser shall thereafter have the right and option to terminate this contract by giving written notice to Seller and Escrowee within thirty (30) days after receipt by Purchaser of the notice from Seller or on the Closing Date, whichever is earlier. If the Closing Date was scheduled to occur after the institution of such proceeding, the Closing Date shall be deemed adjourned in order that Purchaser shall have its full thirty-day period within which to determine whether or not to proceed with Closing. If Purchaser timely terminates this contract, Purchaser shall be entitled to receive the Downpayment from Escrowee and this contract shall thereupon be terminated and become void and of no further effect, and neither party hereto shall have any obligations of any nature to the other hereunder or by reason hereof, except for those obligations and liabilities that are expressly stated to survive termination of this contract. If Purchaser does not elect to terminate this contract, the parties hereto shall proceed to the Closing and at the Closing, Seller shall assign to Purchaser all of its right, title and interest in all awards in connection with such taking and shall pay to Purchaser any award paid to Seller with respect to such taking. Purchaser shall have the right to participate in discussions or

proceedings with any governmental authority relating to the proposed taking of any portion of the Premises.

§8.03. The provisions of this Section 8 shall survive the Closing.

**Section 9. Covenants of Seller**

Seller covenants that between the date of this contract and the Closing:

§9.01. Intentionally omitted.

§9.02. Seller shall not modify or amend any Service Contract or enter into any new service contract unless the same is terminable without penalty or fee by the then owner of the Premises upon not more than 30 days' notice.

§9.03. Seller shall maintain in full force and effect until the Closing the insurance policies described in Schedule G attached hereto.

§9.04. No fixtures, equipment or personal property included in this sale shall be removed from the Premises unless the same are replaced with similar items of at least equal quality prior to the Closing.

§9.05. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld or delayed.

§9.06. Seller shall allow Purchaser or Purchaser's representatives access to the Premises (provided such access shall not unreasonably interfere with the occupancy of tenants), the Leases and other documents required to be delivered under this contract upon reasonable prior notice at reasonable times.

§9.07. Seller shall operate the Premises in substantially the same manner as the Premises are being operated on the date of this contract.

**Section 10. Seller's Closing Obligations**

§10.01. At the Closing, Seller shall deliver, to the extent they are then in Seller's possession, the following to Purchaser:

(a) A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by Section 13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this contract.

(b) All Leases, assignments of leases, subleases, subordination, nondisturbance and attornment agreements and tenant files and records in its possession.

(c) A schedule of all security deposits (and, if the Premises contains six or more family dwelling units, the most recent reports with respect thereto issued by each banking organization in which they are deposited pursuant to GOL §7-103) and a check or credit to Purchaser in the amount of any cash security deposits, including any interest thereon, held by Seller on the Closing Date or, if held by an institutional lender, an assignment to Purchaser and written instructions to the holder of such deposits to transfer the same to Purchaser, and appropriate instruments of transfer or assignment with respect to any security deposits which are other than cash.

(d) A schedule updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

(e) All Service Contracts initialed by Purchaser and all others in Seller's possession which are in effect on the Closing Date and which are assignable by Seller.

(f) An assignment to Purchaser, without recourse or warranty, of all of the interest of Seller, if any, in the Service Contracts, union contracts, certificates, permits and other documents to be delivered to Purchaser at the Closing which are then in effect and are assignable by Seller.

(g) To the extent they are then in Seller's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

(h) Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies, work by the City of New York (if the Premises are in the City of New York), emergency repair liens of the City of New York (if the Premises are in the City of New York) or other returns against persons or entities whose names are the same as or similar to Seller's name, to omit the rights of parties who are no longer in possession and to limit the exception for tenants and occupants to those having "rights as tenants only".

(i) (i) Checks to the order of the appropriate officers or the Title Company in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks if required by the taxing authority or the Title Company unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof, and (ii) a certification of non-foreign status, in form required by the Code Withholding Section, signed under penalty of perjury, and (iii) Form RP-5217 (or, in New York City, Form RP-5217NYC). Seller understands that such certification will be retained by Purchaser and will be made available to the Internal Revenue Service on request.

(j) Intentionally omitted.

(k) If Seller is a corporation and if required by Section 909 of the Business Corporation Law, a resolution of Seller's board of directors authorizing the sale and delivery of the deed and a certificate executed by the secretary or assistant secretary of Seller certifying as to the adoption of such resolution and setting forth facts showing that the transfer complies with the requirements of such law and the deed referred to in §10.01(a) shall also contain a recital sufficient to establish compliance with such law. If Seller is a partnership or limited liability company, the written consent of the partners or members to the extent required by the partnership agreement or operating agreement and delivery of a certificate executed by the general partner of any partnership or by the manager (if any) or a member of a limited liability company, attaching true and complete copies of the organizational documents of Seller and affirming that the sale and conveyance of title comply with the requirements of such organizational documents (or of the applicable statute, if any).

(l) Possession of the Premises in the condition required by this contract, subject to the Leases and Tenancies, and keys therefor.

(m) A blanket assignment, without recourse or representation, of all Seller's right, title and interest, if any, to all contractors', suppliers', materialmen's and builders' guarantees and warranties of workmanship and/or materials in force and effect with respect to the Premises on the Closing Date and a true and complete copy of each thereof.

(n) Estoppel letters in the form attached hereto as Schedule F from the following tenants: ____________________________________________________.

(o) A blanket assignment of all Leases and an agreement to indemnify and defend Purchaser against any claims made by tenants, subtenants, occupants or licensees with respect to any failure of Seller to perform its obligations prior to the Closing Date.

(p) Upon request of Purchaser, a bill of sale transferring to Purchaser the Personal Property free and clear of all liens and encumbrances except, if applicable, for the lien of the holder of the Existing Mortgage.

(q) Any other documents required by this contract to be delivered by Seller.

**Section 11. Purchaser's Closing Obligations**

At the Closing, Purchaser shall:

§11.01. Subject to §§2.02 and 18.02, pay to Seller (and/or to Seller's designee(s) provided Seller shall have given notice to Purchaser of the name(s) of such designee(s) not less

than two days prior to Closing) by wire transfer in immediately available federal funds to Seller (and/or such designee(s)), the portion of the Purchase Price payable at the Closing, as adjusted for apportionments under §12 and any other credits or adjustments provided in this contract.

§11.02. Intentionally omitted

§11.03. Deliver to Seller an agreement indemnifying and agreeing to defend Seller against any claims made by tenants with respect to tenants' security deposits to the extent paid, credited or assigned to Purchaser under §10.01(c).

§11.04. Duly complete and sign all required real property transfer tax returns and all tax reports (such as RP-5217), and cause all such returns, reports and checks in payment of such taxes to be delivered to the appropriate officers promptly after the Closing.

§11.05. Deliver to Seller an agreement assuming all of landlord's obligations under the Leases and any subordination, nondisturbance and attornment agreement given by Seller to a subtenant from and after the Closing Date and indemnifying and agreeing to defend Seller against any claims made by tenants, subtenants, licensees or occupants with respect to any failure to perform such obligations.

§11.06. Deliver to Seller a certificate confirming that the warranties and representations of Purchaser set forth in this contract are true and complete as of the Closing Date (the statements made in such certificate shall be subject to the same limitations on survival as are applicable to Purchaser's representations and warranties under §5).

§11.07. Intentionally omitted.

§11.08. Deliver to Seller an agreement assuming all Seller's obligations for brokerage commissions payable after the Closing with respect to leases entered into by Seller prior to the Closing to the extent such obligations have been disclosed to Purchaser in Schedule E.

§11.09. Deliver any other documents required by this contract to be delivered by Purchaser.

**Section 12. Apportionments**

§12.01. The following apportionments shall be made between the parties at the Closing as of the close of business on the day prior to the Closing Date:

(a) prepaid rents and Additional Rents (as defined in §12.03) and revenues, if any, from telephone booths, vending machines and other income-producing agreements to the extent collected;

(b) interest on the Existing Mortgage(s) and any Existing Mortgage escrow accounts to the extent assigned to Purchaser;

(c) real estate taxes, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the

Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(d) wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises, whose employment was not terminated at or prior to the Closing;

(e) value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes, as shown on the invoices of Seller's supplier;

(f) charges under transferable Service Contracts or permitted renewals or replacements thereof;

(g) permitted administrative charges, if any, on tenants' security deposits;

(h) dues to rent stabilization associations, if any;

(i) Reletting Expenses under §6.02, if any;

(j) Accrued senior citizen exemptions, if any; and

(k) any other items listed in Schedule D, including assessments.

If on the Closing Date the Premises shall be affected by an assessment which is or may become payable in annual installments, all installments allocable to the period following the Closing Date shall be Purchaser's responsibility.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation shall be promptly corrected, which obligation shall survive the Closing.

Any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

Real estate tax refunds, abatements and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be apportioned between Seller and Purchaser, after deducting the expenses of collection thereof, which obligation shall survive the Closing.

Prior to the Closing Date Seller shall use commercially reasonable efforts to obtain from the agency of the City of New York having jurisdiction thereof readings of all water meters at the Premises within the 30-day period preceding the Closing Date.

§12.02. If any tenant is in arrears in the payment of rent on the Closing Date, rents received from such tenant after the Closing shall be applied in the following order of priority: (a)

first to the month preceding the month in which the Closing occurred; (b) then to the month in which the Closing occurred; (c) then to any month or months following the month in which the Closing occurred; and (d) then to the period prior to the month preceding the month in which the Closing occurred. If rents or any portion thereof received by Seller or Purchaser after the Closing are payable to the other party by reason of this allocation, the appropriate sum, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, shall be promptly paid to the other parry, which obligation shall survive the Closing.

§12.03. If any tenants are required to pay percentage rent, escalation or pass-through charges for real estate taxes, operating expenses, or other charges, cost-of-living adjustments or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which are attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to Seller Seller's proportionate share thereof, less a proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, if and when the tenant paying the same has made all payments of rent and Additional Rent then due to Purchaser pursuant to the tenant's Lease, which obligation shall survive the Closing. If any tenant is or becomes entitled to a refund of overpayments of Additional Rent which are attributable in whole or in part to any period prior to the Closing, Seller shall pay to Purchaser an amount equal to the amount of such refund attributable to any such period within ten days after notice from Purchaser, which obligation shall survive the Closing.

**Section 13. Remedies for Purchaser's Default, Procedure on Termination of Contract by Purchaser**

§13.01. Intentionally omitted

§13.02. Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may, only as authorized by the Sale Order and the closing statement approved by the Secured Creditor, be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made a reasonable time before the Closing, Purchaser shall provide at the Closing separate checks for the foregoing payable to the order of the holder of any such lien, charge or encumbrance and otherwise complying with §2.02. If Purchaser's title insurance company is willing to insure Purchaser that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then Seller shall have the right, in lieu of payment and discharge, to deposit with the title insurance company such funds or assurances or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.03. Notwithstanding anything to the contrary contained herein, if Purchaser shall default in the performance of its obligations under this contract, the sole remedy of Seller

shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain, subject, however, to Seller's rights under §14 and §17.04.

§13.04. If Seller shall willfully and materially default in the performance of its obligations under this contract, Purchaser, if not itself in default, shall give Seller and the Secured Creditor written notice specifying the default and at least five business days to cure. Seller may extend Closing for that cure period with the Secured Creditor's written consent. If the default remains uncured, Purchaser's sole remedy shall be either to terminate and receive the Downpayment under §13.05 or to seek specific performance. No claim or action shall itself extend Closing or suspend Purchaser's obligations absent a court order. Purchaser waives damages for loss of its bargain and all other damages for such default.

§13.05. If (a) Purchaser validly exercises an express termination right under this contract, or (b) Purchaser or Seller terminates this contract pursuant to a provision that refers to this Section, the sole liability of Seller shall be to refund the Downpayment to Purchaser. Upon the giving of the termination notice and Seller's refund of the Downpayment, this contract shall be null and void and the parties hereto shall be relieved of all further obligations and liability. No allegation of Seller default or unilateral refund demand shall itself entitle Purchaser to the Downpayment. A refund requires the written approval of Seller and the Secured Creditor or an order of the Bankruptcy Court authorizing it.

**Section 14. Broker**

§14.01. If a broker is specified in Schedule D, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in Schedule D. The commission of such broker shall be paid pursuant to separate agreement by the party specified in Schedule D, subject to approval by the Bankruptcy Court. Unless otherwise provided in Schedule D, Seller and Purchaser shall indemnify and defend each other against any costs, claims or expenses, including reasonable attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph. The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this contract.

**Section 15. Notices**

§15.01. All notices under this contract shall be in writing and shall be delivered personally with receipt acknowledged or shall be sent by (i) prepaid nationally recognized overnight courier for next business day delivery, and (ii) email transmission in each case addressed as set forth in Schedule D or as Seller or Purchaser shall otherwise have given notice as herein provided. Notice sent by overnight courier shall be deemed received on the first business day following delivery to the overnight courier. Email notice shall be deemed received when transmitted without an automated failure notice before 5:00 p.m. New York time on a business day, and otherwise on the next business day; any required courier copy must also be sent. All notices, including default, termination, title-objection and Closing notices, and all proposed

amendments, waivers and escrow instructions, shall simultaneously be delivered to the Secured Creditor c/o Rubin LLC at the notice address and email in Schedule D.

**Section 16. Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01. Except as otherwise provided in this contract, no representations, warranties, covenants or other obligations of Seller set forth in this contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02. The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this contract to survive the Closing.

**Section 17. Intentionally omitted.**

**Section 18. Miscellaneous Provisions**

§18.01. This contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this contract. Neither this contract nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument. In addition, no amendment, waiver, extension, termination, assignment, reduction of the Purchase Price, credit not expressly provided herein, settlement or disposition of the Downpayment shall be effective without the Secured Creditor's prior written consent, except as otherwise ordered by the Bankruptcy Court after notice to the Secured Creditor.

§18.02. Notwithstanding anything to the contrary set forth herein, for the avoidance of doubt, Secured Creditor will have no liability with respect to any representations hereunder, or otherwise, in connection with this Contract or the transactions contemplated hereunder. The Secured Creditor is an express intended third-party beneficiary entitled to enforce Purchaser's payment and Closing obligations and §§2.03, 13.03, 15.01 and 18.01 and this §18.02 directly, without duplicate recovery or conflicting remedies. Seller shall obtain provisions in the Sale Order recognizing the Secured Creditor's mortgage lien and providing that its liens attach to the estate's interest in the Downpayment and its earnings, forfeited deposits and default recoveries whether or not the sale closes, and all sale proceeds, with the validity, extent and priority determined by the Bankruptcy Court. All such funds shall be held separately and paid only under the Bankruptcy Court's distribution order. After authorized senior claims, expenses and reserves, the Secured Creditor shall be paid to the extent of its entitlement before any distribution to Seller or junior claimants. The closing statement and escrow disbursement instructions require its prior written approval or a further court order after notice to it. Nothing herein subjects third-party trust funds or a validly refundable purchaser deposit to an otherwise nonexistent lien. Neither the Secured Creditor nor Rubin LLC makes or assumes any Seller representation, warranty, covenant or obligation, or becomes a seller, guarantor or escrow fiduciary by consent, participation or

enforcement. No credit bid reduces the Secured Creditor's claim before consummation, and no adjustment or credit may impair its authorized credit bid or require additional cash from it without its written consent or further court order after notice. All rights under the loan documents, Bankruptcy Code and controlling orders are preserved, except to the extent expressly modified by an authorized closing or order.This §18.02 survives Closing and termination.

§18.03. This Agreement will be governed by and construed in accordance with the United States Bankruptcy Code, and to the extent applicable to contract matters, the laws of the State of New York. Any action, proceeding or contested matter involving or related to this Contract, the Bid Procedures or the Sale Order may only be brought in the Bankruptcy Court. Service of any summons and complaint, any motion, or any other process in connection with any dispute involving or related to this Contract, the Bid Procedures or the Sale Order may be made via certified mail directed to Seller or Purchaser, as the case may be, with a copy to the Secured Creditor, at the address set forth herein, personally service being irrevocably waived.

§18.04. The captions in this contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

§18.05. Purchaser may assign this Contract to an affiliate of Purchaser or to a newly formed entity controlled by Purchaser or its principals only with Seller's prior written consent, which consent may not be unreasonably withheld, conditioned or delayed, provided that (i) no such assignment will relieve Purchaser of its obligations hereunder (ii) the assignee must assume all of Purchaser's obligations under this Agreement in a writing acceptable to Seller and (iii) such assignment is consistent with, and does not require modification of the Bid Procedures or the Sale Order. No permitted assignment of Purchaser's rights under this contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Seller shall have been furnished with the name and address of the assignee. This contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§18.06. In consideration of participation in the auction, Purchaser's execution and delivery of this Contract constitutes its binding agreement to the approved Bid Procedures and an irrevocable bid for the period prescribed therein. Upon designation as successful bidder, Purchaser shall not withdraw and is bound to fund the Downpayment and perform its preclosing obligations. Seller shall promptly countersign and deliver this Contract upon such designation, and shall not defer execution until entry of the Sale Order. Entry and effectiveness of the Sale Order are conditions to consummation only and do not excuse Purchaser's bid, deposit or preclosing obligations. Except for that independently binding bid undertaking, this Contract becomes effective upon execution and delivery by Seller and Purchaser.

§18.07. As used in this contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§18.08. If the provisions of any schedule or rider to this contract are inconsistent with the provisions of this contract, the provisions of such schedule or rider shall prevail, provided

that no schedule or rider shall override §§2.03, 13.03, 18.01, 18.02 or 18.06 without the Secured Creditor's express written consent. Set forth in Schedule D is a list of any and all schedules and riders which are attached hereto but which are not listed in the Table of Contents.

§18.09. This contract may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall be one instrument.

IN WITNESS WHEREOF, the parties hereto have executed this contract as of the date first above written.

Seller:

Purchaser:

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $_________to be held in escrow. Escrowee agrees to be bound by the escrow and disbursement provisions of §§2.03 and 18.02.

______________________________________

# Schedule A

## DESCRIPTION OF PREMISES

**(to be attached separately and to include tax map designation)**

## Schedule B

## PERMITTED EXCEPTIONS

1. Zoning and subdivision laws, regulations and ordinances and landmark, historic or wetlands designations.

2. Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3. If Schedule C provides for the acceptance of title by Purchaser subject to one or more Existing Mortgage(s), the Existing Mortgage(s) and financing statements, assignments of leases and other agreements ancillary thereto.

4. Leases and Tenancies specified in the Rent Schedule and any new leases, tenancies, occupancy agreements and licenses not prohibited by this contract.

5. Unpaid installments of assessments not due and payable on or before the Closing Date; and real estate taxes that are a lien but are not yet due and payable.

6. Financing statements, chattel mortgages and liens on personalty filed more than 5 years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or owned by Tenants.

7. Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises.

8. Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

9. Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

10. Any state of facts that an accurate survey would disclose. For the purposes of this contract, none of the facts shown on the survey, if any, identified below shall be deemed to render title uninsurable or unmarketable, and Purchaser shall accept title subject thereto: ______________________.

**Schedule C**

**PURCHASE PRICE**

The Purchase Price shall be paid as follows:

| | | |
|---|---|---|
| (a) | By wire transfer upon Purchaser's submission of its bid to purchase the Premises (the Downpayment) (except in the case of a credit bid by Debtor' existing mortgagee): | $ |
| (b) | By wire transfers in accordance with the terms of the Sale Order: | $ |
| (c) | Intentionally omitted.<br>________________________________ | N/A |
| (d) | Intentionally omitted: | N/A |
| (e) | Total Purchase Price: | $ |

**Schedule D**

**MISCELLANEOUS**

1. Address of Premises:51 South Route 9W, West Haverstraw, NY 10993

2. Title insurer designated by Purchaser (§1.02):

3. Last date for consent by Existing Mortgagee(s) (§2.03(b)):N/A

4. Prepayment Date on or after which Purchase Money Mortgage may be prepaid (§2.05(c)(1)):N/A

5. Maximum Interest Rate of any Refinanced Mortgage (§2.05(b)):N/A

6. Seller's tax identification number:85-4192161

7. Purchaser's tax identification number:

8. Scheduled time and date of Closing (§3.01):See Bid Procedures; insert the specific date and time before bidding: ____________________ (New York time)

9. Place of Closing (§3.01):Bronson Law Offices, 480 Mamaroneck Ave., Harrison, NY 10528

10. Assessed valuation of Premises (§4.10):

Actual Assessment:

Transition Assessment:

11. Fiscal year and annual real estate taxes on Premises (§4.10):

12. Tax abatements or exemptions affecting Premises (§4.10):

13. Assessments on Premises (§4.13):

14. Maximum Amount which Seller must spend to cure violations, etc. (§7.02):N/A

15. Maximum Expense of Seller to cure title defects, etc. (§13.02):N/A

16. Broker, if any (§14:01):Royal Properties Inc.

17. Party to pay broker's commission (§14:01): Seller

18. Address for notices (§15.01):

If to Seller: c/o Bronson Law Offices PC, 480 Mamronck Ave., Harrison, NY 10528, Attn: Bruce Bronson, (hbbronson@bronsonlaw.net)

with a copy to Seller's attorney:

If to Purchaser:

with a copy to Purchaser's attorney:

A copy of any and all notices sent under this agreement must also be sent to counsel to the Secured Creditor, Rubin LLC, 11 Broadway, Suite 715, New York, New York 10004, Attn: Paul Rubin (prubin@rubinlawllc.com)

19. Additional Schedules or Riders (§18.08):

20. The Property is being sold as is, where is, with only the adjustments expressly provided in this Contract. The sole bankruptcy-sale condition to Closing is entry of an effective, unstayed Sale Order authorizing this sale under Bankruptcy Code §363(f), substantially in the form made available before the auction. An appeal, motion for reconsideration or unexpired appeal period, without an operative stay, shall not excuse or delay Closing; no final nonappealable order is required. Purchaser may not require additional findings, releases or lender approvals.

**Schedule E**

**RENT SCHEDULE**

**(to be attached separately)**

**None**

**Schedule F**

**FORM OF ESTOPPEL LETTER**

**(to be attached separately)**

**None**

**Schedule G**

**INSURANCE POLICIES**

**None**

## Schedule H

**Intentionally Omitted**

**Schedule I**

**SERVICE CONTRACTS**

**None**

**Schedule J**

**CERTIFICATE OF OCCUPANCY**

**N/A**

**Schedule K**

**PURCHASE MONEY NOTE AND MORTGAGE**

**N/A**